UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| | |
|---|---|
| WORLD WIDE STREET PREACHERS' FELLOWSHIP, ET AL. | CIVIL ACTION NO. 05-0513 |
| VERSUS | JUDGE ROBERT G. JAMES |
| TOWN OF COLUMBIA, LOUISIANA | MAG. JUDGE JAMES D. KIRK |

RULING

This case arises from demonstrations by Plaintiffs World Wide Street Preachers

Fellowship ("WWSPF") and Kenneth Coleman, Sr. ("Coleman") (collectively, "the Preachers")

in the Town of Columbia, Louisiana ("Columbia").  After the Preachers were required to

disassemble and one of their members was arrested, they brought suit against Columbia under 42

U.S.C. § 1983 for violations of their rights to free speech, free exercise of religion, and free

assembly guaranteed by the First and Fourteenth Amendments to the United States Constitution.

Pending before the Court are second cross Motions for Summary Judgment [Doc. Nos. 60

& 61].  Both parties have filed memoranda in opposition [Doc. Nos. 75 & 76], and Columbia has

filed a Reply in support of its Motion for Summary Judgment [Doc. No. 81].   For the following

reasons, Columbia's (second) Motion for Summary Judgment [Doc. No. 60] and the Preachers'

Second Motion for Summary Judgment [Doc. No. 61] are DENIED.

I.      FACTS AND PROCEDURAL HISTORY

WWSPF is an organization of street preachers.  Coleman and his pastor, Allen Russell

("Russell"), are members of WWSPF.  While demonstrating, members of WWSPF carry signs

reflecting their religious beliefs, including the belief that abortion is a sin.  Some signs display

pictures of aborted fetuses.  The Preachers have carried these signs on numerous occasions in Columbia and in other locales.

When demonstrating in Columbia, the Preachers stood near the intersection of Highway 165 and Church Street ("the intersection") where passing motorists were forced to slow down or stop for a traffic signal.

During demonstrations on December 27, 2003; December 30, 2003; and May 15, 2004, the Preachers had interactions with Columbia police, but were not required to disassemble.[1]

On February 12, 2005, the Preachers returned to Columbia to demonstrate.  In its Opinion, the Fifth Circuit characterized the events of that date as follows:

> Things came to a head on February 12, 2005, when Plaintiffs were demonstrating along Highway 165 in the southeast corner of the intersection with Church Street. State Trooper John Wiles ("Wiles") passed by and contacted the Columbia police department. He said that he witnessed several [of the Preachers] either standing on the white fog line or on the highway itself and asked that the Columbia police move the demonstrators back from the road.  The police department had also previously received complaints from United Methodist about [the Preachers] standing on its property.
>
> Several Columbia police officers, including [Officer Robert Miles, the Assistant Police Chief], responded. The DVD of the events that followed is only a few minutes long and begins after the police officers arrived at the scene. There appear to have been fewer than ten demonstrators that day, but one was holding a sign depicting an aborted [fetus]. Some demonstrators were standing on United Methodist's property, although it is unclear if they had been standing there the entire time or had moved there after three police cars parked on the shoulder.
>
> Miles told the demonstrators that they had five minutes to get off the property and leave. When Russell began to argue with him, Miles stated, "This is the church property. They don't want you here. And this is state's property. They don't want you here." He also stated, "You are disrupting everybody." When Russell continued to

---

[1]Each of these incidents has previously been detailed in the Court's rulings and in the opinion of the United States Court of Appeal for the Fifth Circuit, so the Court will not recount them here.  See World Wide Street Preachers Fellowship v. Town of Columbia, 245 Fed. Appx. 336, 2007 WL 1655304 (5th Cir. June 6, 2007).

argue that they had a right to be on public property, Miles arrested him. It appears Russell may have been standing on the shoulder at that time, but the DVD evidence is not conclusive.[2]   While arresting Russell, Miles turned to the remaining demonstrators and asked "All of y'all want to go, too?" Miles further told the demonstrators that "[y]ou cannot picket, boycott on State property or right-of-way"and to "[p]ut that sign away and y'all get off this parking lot or I will arrest every one of you." The demonstrators then left.

Miles's affidavit of probable cause for Russell's arrest states that Miles "approached the group and advised them that they were causing a disturbance with their actions, and pictures and that [sic] were on the state right of way, and that they needed to leave the area . . . The group didn't have any permit to be on the right of way, and they were to [sic] close to the flashing red beacon (red light). . . ."  Russell was charged with resisting an officer (La. Rev. Stat. Ann. § 14:108, the "Resisting statute"), stopping or standing in specified areas (La. Rev. Stat. Ann. § 32:143, the "Standing statute"), and demonstrating without a permit (La. Rev. Stat. Ann. § 14:326, the "Permit statute"). No mention is made of what happened to these charges, but Russell spent two days in jail as a result.

2007 WL 1655304 at *2-3, 245 Fed. Appx. at 340.

Prior to arresting Russell, Miles did not discuss the charges with Chief of Police Douglas Crockett ("Chief Crockett") or anyone else, and Columbia had no official policy on protesters or demonstrations.  Miles had received Louisiana Police Officers Standard Training ("POST") and was POST-certified.  He had also received training on civil and First Amendment rights at the police academy and had some additional education in criminal justice from Grambling State University.  Although Miles had several interactions with the Preachers, he had never been dispatched based on citizen complaints and was aware that they had the right to demonstrate.

On March 22, 2005, the Preachers filed the instant suit.

On March 23, 2005, the Court issued a temporary restraining order, which enjoined Columbia from interfering with the Preachers' First Amendment activities until a preliminary

---

[2]Russell denies in deposition testimony that the Preachers stood in the gravel area in front of the Methodist Church.

injunction hearing could be held.

On March 25, 2005, the Preachers again demonstrated in Columbia.

On March 26, 2005, Columbia police officer Clay Bennett told Russell's wife, Robin Russell, that the Preachers had to obtain a permit prior to returning to demonstrate.

On April 1, 2005, the Court held a hearing on the Preachers' request for preliminary injunction.

On May 5, 2005, the Court issued an Opinion, granting in part and denying in part the Preachers' request for a preliminary injunction.  The Court enjoined Columbia from enforcing the Standing, Resisting, and Permit statutes as those statutes had been applied.

On May 21, 2005, the Preachers returned to Columbia to demonstrate during the River Boat Days Festival.  The Preachers stood on the sidewalk along the Ouachita River Bridge near the intersection of Highway 165 and Pearl Street.  Several minutes of video footage reveal confrontations between the Preachers and Columbia police officers, as well as the Sheriff of Caldwell Parish and another police officer from Grayson, Louisiana.  During the final portion of the footage, it appears that the Preachers were still located on the sidewalk, but had moved closer to the intersection at the base of the bridge.  Officers attempted to move the Preachers further up the sidewalk away from the intersection, but they refused.  Coleman and Russell were ultimately arrested.[3]

In November 2005, the parties then filed cross motions for summary judgment.  The Preachers sought a declaration that their First Amendment rights had been violated, permanent injunctive relief, and nominal damages.  Columbia sought to have the case dismissed with

--------

[3]"Plaintiffs state in their briefing that the May 21, 2005, events are not part of this lawsuit."  245 Fed. Appx. at 342, 2007 WL 1655304 at *5.

prejudice arguing that there has been no violation of 42 U.S.C. § 1983.

On January 25, 2006, the Court issued a Ruling and Judgment granting Columbia's

motion for summary judgment and denying the Preachers' motion for summary judgment.

On February 23, 2006, the Preachers appealed.

On June 6, 2007, the United States Fifth Circuit Court of Appeal issued its opinion,

reversing this Court's grant of summary judgment to Columbia and affirming the denial of the

Preachers' motion for summary judgment.  The Fifth Circuit held that

> there is simply too much uncertainty about the motivations of the governmental
> action to determine whether a First Amendment violation took place. . . . there is a
> fact issue regarding whether the officers were actually motivated by the content of
> [the Preachers'] demonstration, which prevents summary judgment on the issue
> of whether the restriction was content-based or content-neutral.  Without knowing the
> motivation for the restriction, we cannot determine which test to apply-strict scrutiny
> or a lesser level of scrutiny.  Summary judgment on this issue was, thus,
> inappropriate.

245 Fed. Appx. at 348-49, 2007 WL 1655304 at *10.

However, the Fifth Circuit also explained:

> We note that municipal liability under 42 U.S.C. § 1983 must be premised on the
> policy or custom of the municipality or the act of a policymaker.  See Pembaur v.
> City of Cincinnati, 475 U.S. 469, 480-81, 106 S. Ct. 1292, 89 L. Ed.2d 452 (1986);
> Monell v. [New York] Depot of Soc. Serve., 436 U.S. 658, 694, 98 S.Ct. 2018, 56
> L. Ed.2d 611 (1978).  **The parties have not raised or briefed this issue; therefore,
> our focus in this case is on the actions of the officers, which is what the parties
> have argued.** But see Collins v. City of Hacker Heights, 503 U.S. 115, 123, 112
> S.Ct. 1061, 117 L. Ed.2d 261 (1992) (stating that a municipality is not subject to
> liability under § 1983 by way of respondeat superior).

245 Fed. Appx. at 345, 2007 WL 1655304 at *6 (emphasis added).

On remand, the parties again filed cross-motions for summary judgment.  Columbia contends

that it is entitled to summary judgment because the Preachers have failed to identify any policy or

custom of Columbia that resulted in the alleged constitutional violation.  Alternatively, Columbia

contends that the actions of Officer Miles were not unconstitutional.  The Preachers respond that they do not have to identify a policy, custom, or act of an official policymaker because they seek only injunctive and declaratory relief, not damages.  Even if they are required to do so, the Preachers contend that they can meet this requirement because Columbia had an established custom of limiting "the ability of the Preachers to exercise their First Amendment rights" through the use of "inapplicable statutes."

In their second motion for summary judgment, the Preachers argue that the actions of Columbia officers were motivated by the content of their speech and cannot survive strict scrutiny review.  Even if the Court were to determine that the officers' actions were not motivated by the content of the Preachers' speech, the Preachers contend that they are entitled to summary judgment under heightened scrutiny.  In either case, the Preachers argue that "shutting down" their First Amendment exercise of rights was inappropriate.

## II.    LAW AND ANALYSIS

### A.    Motions for Summary Judgment

Summary judgment is appropriate only when the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, show there are no genuine issues as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The moving party bears the initial burden of informing the court of the basis for its motion by identifying portions of the record that highlight the absence of genuine issues of material fact.  Topalian v. Ehrmann, 954 F.2d 1125, 1132 (5th Cir. 1992).  A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute about a fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party.  Id.  The moving party

cannot satisfy its initial burden simply by setting forth conclusory statements that the nonmoving party has no evidence to prove its case.  Ashe v. Corley, 992 F.2d 540, 543  (5th Cir. 1993).

If the moving party can meet the initial burden, the burden then shifts to the nonmoving party to establish the existence of a genuine issue of material fact for trial.  Norman v. Apache Corp., 19 F.3d 1017, 1023 (5th Cir. 1994).  "The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which the evidence supports his or her claim."  Ragas v. Tenn. Gas Pipeline Co., 136 F.3d 455, 458 (5th Cir. 1998). The nonmoving party must show more than "some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd.  v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In evaluating the evidence tendered by the parties, the court must accept the evidence of the nonmovant as credible and draw all justifiable inferences in its favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

### B.      42 U.S.C. § 1983

Title 42, U.S.C. § 1983, derived from § 1 of the Civil Rights Act of 1871, provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

### A.      Applicability of Monell

In a § 1983 lawsuit against a municipality, a plaintiff must show that his constitutional injury was the result of official policy, custom, or the act of an official policy maker.  Monell, 436 U.S. at 694; see also Williams v. Kaufman County, 352  F.3d 994, 1013 (5th Cir. 2003) ("The law is well-established that a municipality . . . can be held liable for its policies and customs that engender constitutional deprivation, but that it cannot be held liable for the actions

7

of its non-policy-making employees under a theory of respondeat superior.").

The Preachers contend that <u>Monell</u> is inapplicable because they seek only injunctive and declaratory relief.  However, the Preachers' contention is legally incorrect.

In <u>Monell</u>, the petitioners were a class of female employees of the New York City Department of Social Services and of the Board of Education.  They alleged that the defendants had, as a matter of official policy,  compelled pregnant employees to take unpaid leaves of absence before such leaves were required for medical reasons.  <u>Id.</u> at 660-61.  The petitioners sought injunctive relief and backpay.  <u>Id.</u> at 661.  The Supreme Court "granted certiorari . . .  to consider [w]hether local governmental officials and/or local independent school boards are persons within the meaning of 42 U.S.C. § 1983 when equitable relief in the nature of back pay is sought against them in their official capacities?" <u>Id.</u> at 662 (internal quotation marks omitted).  After a lengthy analysis of the legislative history of § 1983 and its amendments, the Supreme Court held that:

> Congress did intend municipalities and other local government units to be included among those persons to whom § 1983 applies.  Local governing bodies, therefore, can be sued directly under § 1983 for monetary, declaratory, **or** injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.  Moreover, although the touchstone of the § 1983 action against a government body is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution, local governments, like every other § 1983 "person," by the very terms of the statute, may be sued for constitutional deprivations visited pursuant to governmental "custom" even though such a custom has not received formal approval through the body's official decisionmaking channels.

<u>Id.</u> at 690-91 (footnotes and citations omitted) (emphasis added).

The Supreme Court stated further:

> On the other hand, the language of § 1983, read against the background of the same legislative history, compels the conclusion that Congress did not intend

> municipalities to be held liable unless action pursuant to official municipal policy
> of some nature caused a constitutional tort.  In particular, we conclude that a
> municipality cannot be held liable solely because it employs a tortfeasor-or, in
> other words, a municipality cannot be held liable under § 1983 on a *respondeat*
> *superior* theory.

Id. at 691.  The Monell Court explained that § 1983 "plainly imposes liability on a government

that, under color of some official policy, 'causes' an employee to violate another's constitutional

rights."  Id. at 691 (emphasis added) (citing 17 Stat. 13).  The Monell Court concluded "that a

local government may not be sued under § 1983 for an injury inflicted solely by its employees or

agents.  Instead, it is when execution of a government's policy or custom, whether made by its

lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts

the injury that the government as an entity is responsible under § 1983."  Id. at 694.

In the years since Monell, only one appellate court has limited its holding to cases in

which the plaintiff seek monetary damages.  See Chaloux v. Killeen, 886 F.2d 247 (9th Cir.

1989) ("We conclude that the Monell doctrine did not intend to limit the reach of plaintiffs

seeking prospective relief under § 1983 . . . [, and] the court erred in applying Monell and its

progeny.").  That decision is not binding on this Court, has not been adopted by any other

circuit[4],  and has even been questioned in the Ninth Circuit.  See Los Angeles Police Protective

League v. Gates, 995 F.2d 1469, 1472 n.1 (9th Cir. 1993) ("In the concurrence there is a

suggestion that Chaloux was wrongly decided.  However meritorious this argument may be, we

are bound by Chaloux under United States v. Mandel, 914 F.2d 1215, 1221 (9th Cir. 1990), and

cannot reconsider it here."); see also 995 F.2d at 1477-78 (Fletcher, J., concurring) (The Chaloux

---

[4]See, e.g., Dirrane v. Brookline Police Dep't., 315 F.3d 65, 71 (1st Cir. 2002) (Rejecting
Chaloux as "at odds with Monell and citing decisions in the Seventh, Eleventh, and Ninth
Circuits either rejecting or questioning the validity of Chaloux).

holding "is in conflict with Monell.  Monell does not distinguish among cases based on the type

of relief sought; it simply holds that a municipality may not be sued *at all* unless the challenged

conduct represents the official policy or custom of the municipality."  Therefore, "we should

avoid the further propagation of an unsound legal proposition that is at odds with Supreme Court

precedent.").

     In this Circuit, the appellate court has not directly addressed this issue, but has applied

Monell's custom or policy requirement to a case where the plaintiff sought only declaratory and

injunctive relief.  See  Gabriel v. City of Plano, 202 F.3d 741, 744-45 (5th Cir. 2000) ("Gabriel

sought equitable remedies under section 1983: a declaratory judgment that his speech and

activities around Clark High were constitutionally protected and a permanent injunction

prohibiting the defendants from enforcing section 37.124," and was required to show that "his

constitutional rights were violated as a result of a custom or policy of the City.").  Therefore, the

Court finds that the Preachers' position is legally incorrect[5] and that they are required to show an

_____

     [5]Even if this Court were to adopt the legal reasoning of Chaloux, which it does not, the
Preachers' argument is also factually inconsistent with its pleadings in this matter.  In the
Complaint, the Preachers plainly state that they seek nominal damages, not just injunctive and
declaratory relief.  See [Doc. No. 1, ¶ 3]; see also 2007 WL 14655304 at *3, 245 Fed Appx. at
341.  The Preachers have not amended their Complaint or otherwise indicated in the record any
intent to withdraw their request for damages.  See Jordan by Jordan v. Jackson, 15 F.3d 333, 338
n.2 (4th Cir. 1994) (Citing Chaloux and another district court case, the plaintiffs argued that
"since their complaint sought only prospective injunctive relief, an allegation of official policy or
custom is unnecessary," but "[t]heir exclusive reliance on these cases is misplaced since, in
addition to injunctive relief, their complaint also seeks nominal damages from the County
defendants.") (citations omitted).

     Although the Fifth Circuit determined that an association is not entitled to "seek damages
for monetary injuries peculiar to individual members where the fact and extent of injury will
required individualized proof," Self-Ins. Inst. of Am. v. Korioth, 53 F.3d 694, 695-96 (5th Cir.
1995), a nominal damages award does not require such individualized proof.  See Louisiana
ACORN Fair Housing v. LeBlanc, 211 F.3d 298, 304 (5th Cir. 2000) (The Fifth Circuit has
recognized that "nominal damages could be presumed from the denial of a constitutional right.").

official policy or custom resulting in their alleged constitutional injury.

### B.    Evidence of Custom or Policy

Having determined that <u>Monell</u> is applicable in this case, the Court must determine whether the evidence is sufficient to show that a policy or custom of Columbia is causally linked to the Preachers' alleged constitutional injuries.  "Proof of municipal liability sufficient to satisfy <u>Monell</u> requires: (1) an official policy (or custom), of which (2) a policy maker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose 'moving force' is that policy (or custom)." <u>Pineda v. City of Houston</u>, 291 F.3d 325, 328 (5th Cir. 2002) (citing <u>Piotrowski v. City of Houston</u>, 237 F.3d 567, 578 (5th Cir. 2001)).

First, the most obvious way a plaintiff may meet this requirement is to show that his constitutional injury was the result of "[a] policy statement, ordinance, regulation, or decision that [was] officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers . . . delegated policy-making authority." <u>Webster v. City of Houston</u>, 352 F.3d 994, 1013 (5th Cir. 2003); <u>see also</u> <u>Monell</u>, 436 U.S. at 691.

Second,  a plaintiff may also establish municipal liability through

> A persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy. Actual or constructive knowledge of such custom must be attributable to the governing body of the municipality or to an official to whom that body had delegated policy-making authority.

<u>Webster v. City of Houston</u>, 735 F.2d 838, 841 (5th Cir. 1984) (en banc); <u>see also</u> <u>Bd. of County Com'rs v. Brown</u>, 520 U.S. 397, 403 (1997) ("[A]n act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to

---

liability on the theory that the relevant practice is so widespread as to have the force of law.")

(citing Monell, 436 U.S. at 690-691) (other citations omitted); City of St. Louis v. Praprotnik,

485 U.S. 112, 127 (1988) ("Relying on the language of § 1983, the Court has long recognized

that a plaintiff may be able to prove the existence of a widespread practice that, although not

authorized by written law or express municipal policy, is so permanent and well settled as to

constitute a custom or usage with the force of law. . . . That principle, which has not been

affected by Monell or subsequent cases, ensures that most deliberate municipal evasions of the

Constitution will be sharply limited.") (citations and internal quotation marks omitted); cf.

Palmer v. City of San Antonio, 810 F.2d 514, 516 (5th Cir. 1987) (Proof of random acts or

isolated events are insufficient to establish custom.)

       Third, in very limited circumstances, a plaintiff may establish municipal liability based on

a single incident.  As the Fifth Circuit has explained, "a single decision by an official can be

grounds for section 1983 liability where the decision was rendered by an individual with 'final

policy making authority,'" as determined under state law.  Gelin v. Housing Authority of New

Orleans, 456 F.3d 525, 527 (5th Cir. 2006) (quoting Jett v. Dallas Indep. Sch. Dist., 491 U.S.

701, 737 (1989) (other citations omitted); Pembaur v. City of Cincinnati, 475 U.S. 469, 482

(1986) ("[W]hether an official had final policymaking authority is a question of state law.").

However, liability on this basis is rare because the act at issue must be taken with "deliberate

indifference to the risk that a violation of a particular constitutional or statutory right will follow

the decision." Brown v. Bryan County, OK, 219 F.3d 450, 460-61 (5th Cir. 2000).  There must

be a "high degree of predictability concerning the consequences of the challenged decision." Id.

at 460; see also Burge v. St. Tammany Parish, 336 F.3d 363, 372 (5th Cir. 2003) (A single

incident may establish official policy "where the facts giving rise to the violation are such that it

should have been apparent to the policymaker that a constitutional violation was the highly

predictable consequence of a particular policy or failure to train.").

Fourth, the Supreme Court expanded Monell in City of Canton v. Harris, 489 U.S. 378,

388 (1989), to include claims for inadequate police training.  To recover under a failure to train

theory, the plaintiff must demonstrate that (1) the failure to train amounted to a deliberate

indifference to the rights of persons with whom the police came in contact and (2) the

municipality's policy actually caused a constitutional injury.  Id. at 389-90.  To constitute

deliberate indifference, the failure to train must reflect a deliberate or conscious choice made by

municipal policymakers.  Id.

Columbia has presented undisputed evidence in this matter that the Preachers cannot meet

their burden under the first method of establishing official policy.  According to the deposition

testimony of Miles and Chief Crockett, Columbia had no official policy relating to

demonstrations.

Miles's actions on February 12, 2005, are also insufficient to hold Columbia liable under

the third method–the single incident exception.  Columbia was organized under the Lawrason

Act, La. Rev. Stat. 33:321, et seq.  Under this Act, the mayor and board of aldermen govern the

municipality.  La. Rev. Stat. 33:362(B).  Louisiana Revised Statute 33:381, titled "Municipal

Officers," states that "[t]he officers of every municipality shall be a mayor, aldermen, a chief of

police, a tax collector, and a clerk."  La. Rev. Stat. 33:381(A). Columbia suggests that only the

Mayor and Board of Aldermen have final policymaking authority, while the Preachers contend

that the Chief of Police has some final policymaking authority.

It is clear under Louisiana law that the Mayor and Board of Aldermen are the final

policymakers with regard to the appointment of police personnel, for the promotion of officers,

to effect disciplinary action, and for dismissal of police personnel.  Grant v. Grace, 2003- 2021

(La. 4/14/04); 870 So.2d 1011.   However, the fact that the Mayor and Board of Aldermen are the

final policymakers with regard to employment decisions does not mean that they are the final

policymakers for Columbia in all regards.  The Chief of Police is the final policy maker with

regard to the day-to-day supervision of the police force and the enforcement of state laws and

municipal ordinances.[6]  See La. Rev. Stat. 33:423 ("The marshal shall be the chief of police and

shall be ex officio a constable.  He shall have general responsibility for law enforcement in the

municipality, and shall be charged with the enforcement of all ordinances within the municipality

and all applicable state laws."); see also Opp. Atty. Gen., No. 98-460, January 6, 1999 ("The

chief of police is the final authority in the day-to-day operation of his office and equipment.  The

governing authority cannot revoke or impair the inherent powers of an elected chief of police,

which powers have been defined 'as the power to supervise the operation of the police

department and assign its personnel and control its equipment.'") (emphasis added) (citing Opp.

Atty. Gen. Nos. 98-204, 97-393, 95-135. ); Op. Atty. Gen., No. 81-1312, January 15, 1982 (An

elected chief of police of municipality subject to the Lawrason Act has discretion to determine

whether charges should be referred to district court or mayor's court).  Certainly, the Board of

Aldermen remained the final policymaking authority with regard to the enactment of ordinances,

but the complaint in this case was not the enactment of an ordinance, but Chief Crockett's

---

[6]The Court must determine whether the Chief of Police is a final policymaker (or has
been delegated policymaking authority) under state law, but the Court's only guidance is the
plain language of the statute and some Louisiana Attorney General opinions. Thus, the Court has
been left to make an Erie "guess" in this matter.  See Praprotnik, 485 U.S. at 125 ("We are not,
of course, predicting that state law will always speak with perfect clarity"); id. at 126-127 ("It
may not be possible to draw an elegant line that will resolve this conundrum").

enforcement of state statutes, and the Chief of Police, not the Mayor or the Board of Aldermen, is charged with enforcing the laws.

Nevertheless, the actions the Preachers challenge were taken by Miles, the Assistant Police Chief.  Miles is not a municipal officer, and there is no evidence that he had been delegated "final policy making authority" on February 12, 2005.  See Love v. King, 784 F.2d 708, 711 (5th Cir. 1986) ("[T]here was no evidence that King, in his capacity as police chief, acted as final authority for the municipality such that his conduct could fairly be said to represent official policy.").  Miles testified that he did not consult Chief Crockett prior to arresting Russell and ending the Preachers' demonstration on February 12, 2005, and there is no evidence that Chief Crockett, even if he is the final policymaker in this context, instructed Miles to take any such actions prior to Russell's arrest.  Accordingly, the Preachers have not raised a genuine issue of material fact for trial under this method.

The Preachers also fail to establish municipal liability under the fourth method–failure to train.  Though "inadequacy of police training may serve as the basis for § 1983 liability," Harris, 489 U.S. at 388, such liability exists only "where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact" and the deficient training actually caused the ultimate injury.  Id. at 388, 391.  The undisputed evidence shows that Miles had received training at the Academy, was post-certified, and had additional education in criminal justice from Grambling State University.  Miles and Chief Crockett both admitted that they were aware the Preachers had the right to demonstrate in Columbia.  Thus, the Preachers have not raised a genuine issue of material fact through this method.

The Preachers focus their main argument on the second method–that Columbia had a practice so widespread or well settled as to constitute custom.  The "custom" upon which the

15

Preachers rely was "to limit the ability of the Preachers to exercise their First Amendment rights, and to accomplish this policy [by] resort[ing] to the use of inapplicable statutes."  Because the Preachers bear the burden of proving Columbia's unconstitutional custom in order to defeat summary judgment,  they must set forth specific facts showing that there is a genuine issue of material fact for trial regarding the use of inapplicable statutes to limit First Amendment rights. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).

In support of their argument, the Preachers point to evidence, both before and after February 12, 2005, in which they allege is sufficient to establish that police in Columbia had a custom that resulted their alleged constitutional injuries, and officials had constructive or actual notice of that custom sufficient to render Columbia liable.  The Preachers point to the following evidence:

- On December 27, 2003, Miles and another officer had a "long discussion" with the Preachers about the content of the Preachers' signs;

- On December 30, 2003, Chief Crockett attempted "to stop the Preachers from displaying their signs";

- On February 18, 2005, counsel for the Preachers wrote a letter to Chief Crockett, detailing First Amendment law and the Preachers' claims;

- On March 16, 2005, counsel for Columbia responded to the February 18, 2005 letter, stating that officers were within the law to arrest Russell and that any further demonstrations at the February 12, 2005 location would require permission of the landowner and a permit;

- On March 26, 2005, Columbia police officer, Clay Bennett, told Russell's wife, Robin Russell, that the Preachers had to obtain a permit before returning to demonstrate;

- On May 21, 2005, Russell and Coleman were arrested after they refused to move away from the intersection for alleged violations of state statute.

In response, Columbia contends that, at best, all the Preachers can show is that Miles

chose to arrest Russell and threaten the other Preachers with arrest under inapplicable statutes because he did not like the pictures on their signs.  There is no evidence that Chief Crockett or the Mayor and Board of Aldermen were actually or constructively aware that Miles intended to take this action or that any City official had approved his conduct prior to Russell's arrest. Relying on the Supreme Court's rationale in <u>Praprotnik</u>, Columbia concludes that "the mere failure to investigate the basis of a subordinate's discretionary decisions does not amount to a delegation of policymaking authority, especially where . . . the wrongfulness of the subordinate's decision arises from a retaliatory motive or other unstated rationale."  485 U.S. at 130.

If the Court were limited to the evidence available on February 12, 2005, Columbia's argument would carry more weight.  There is no dispute that Miles and another officer first encountered the Preachers during their December 27, 2003 demonstration and that Miles made statements to the Preachers about the pictures on their signs.  It is also undisputed, however, that the Preachers were allowed to continue their demonstration.[7]  The same month when the

---

[7]The Fifth Circuit recounted the December 2003 incident as follows:

During their conversation, Miles made the following statements:

- We don't mind you all holding up the signs but do you have to hold up those .  .  . pictures?

- If it's offensive to one person, that makes it wrong.

- It's just like disturbing the peace.

- It's not the fact that you're out here. It's the fact that your signs are offensive.

Miles, however, indicated that he agreed with [the Preachers'] anti-abortion message. He also repeatedly asked that the [Preachers] remain behind the white fog line on the edge of the highway. [The Preachers] continued with their demonstration and were not required to put away their signs.

Preachers were again demonstrating in Columbia, it is undisputed that Chief Crockett spoke with them and asked them to put away their signs until he could determine whether their activities were legal.  Yet, when they refused, Chief Crockett allowed their demonstration to continue.  If anything, the "custom" of Columbia appeared to be to allow the demonstrations to continue until February 12, 2005.  Even then, as the Court has previously discussed, there is no apparent evidence of a custom of using inapplicable statutes to harass the Preachers.[8]

The Court must also consider the actions and statements of Columbia officials following the February 12, 2005 incident.  The Fifth Circuit has recognized that subsequent conduct by a municipal policymaker may be used to prove preexisting disposition and policy, see Grandstaff v. City of Borger, Tex., 767 F.2d 161 (5th Cir. 1985), but this proposition is not so broad to hold a municipality liable merely because a "policymaker defends his subordinates and . . . those subordinates are later found to have broken the law."  Coon v. Ledbetter, 780 F.2d 1158, 1161 (5th Cir.1986).  The "illegal behavior can [not] be assumed to have resulted from an official policy."  Id.; see also Hudspeth v. City of Shreveport, No. 07-30260, 2008 WL 749547 at *6 (5th Cir. March 19, 2008) (quoting same).

Applying the Fifth Circuit's instructions, the Court is not persuaded that the March 2005 letter from Columbia's attorney nor the statement of Officer Bennett are sufficient to establish a custom of improperly using state statutes to suppress the Preachers' First Amendment rights.

---

245 Fed. Appx. at 339, 2007 WL 1655304 at *1.

[8]Although the Preachers state that their First Amendment rights would have been violated earlier if they had succumbed to the request of Columbia police officers, they do not point to any threats of arrest or other sanctions or any other use of "coercive power."  Cf.  245 Fed. Appx. 343, 2007 WL 1655304 at *5 (citing NAACP v. Button, 371 U.S. 415, 433(1963); Aebisher v. Ryan, 622 F.2d 651, 655 (2d Cir.1980)).

These statements were made prior to the Court's issuance of its opinion that the statutes in question did not apply to the Preachers' demonstration.  At worst, they appear to evidence an incorrect interpretation of the law, not a "custom" to be used against the Preachers.  See Grove v. City of York, PA, 342 F. Supp.2d 291, (M.D. Pa. 2004) ("The court fails to see how Chief Hill's failure to investigate Plaintiffs' claims constitutes a violation of Plaintiffs' constitutional rights" because "Praprotnik requires more than . . . the mere failure to investigate the discretionary decisions of" officers, or a "failure to act on the representations made by Plaintiffs' counsel.").

If it were not for the final encounter between the Preachers and Columbia police officers on May 21, 2005, this Court might be inclined to grant summary judgment to Columbia. Although not part of the lawsuit, the Preachers can rely on the events of May 21, 2005, as evidence to show that Columbia had a custom on February 12, 2005, of applying inapplicable statutes to stop them from exercising their First Amendment rights.  The events of May 21, 2005, have been captured, in part, on DVDs.  After careful review, the Court finds evidence that Chief Crockett, Miles, and another Columbia police officer did, in fact, move the Preachers back from the intersection based on the standing statute, a statute this Court had declared inapplicable in its May 5, 2005 ruling on the Preachers' request for preliminary injunctive relief.  Officers asked the Preachers to move twenty-five feet from the intersection, and the Preachers can be heard on the video explaining, more than once, that the Court determined the Standing statute applied only to vehicles and the Court's decision does not require them to stand twenty-five feet from the intersection.  Nevertheless, the officers, including Chief Crockett, continued to insist that the Preachers move up the sidewalk away from the intersection.  Although Chief Crockett testified that they were doing so because of heavy traffic and because they were allowing antique cars in and out of the intersection for the Antique Car Show at the River Boat Days Festival, his

19

testimony appears at least partially inconsistent with the statements made on the DVDs.[9]

Under these circumstances, the Court finds that the Preachers have raised a genuine issue of material fact whether there was a "widespread practice," i.e., a custom, of using inapplicable statutes to regulate the Preachers' First Amendment rights. The Court expresses no opinion as to whether the Preachers might be able to show at trial that this custom existed prior to May 21, 2005, only that neither the Preachers nor Columbia are entitled to summary judgment on this issue. Because the Preachers have failed to meet their evidentiary burden of proving municipal custom, their second Motion for Summary Judgment is DENIED.

However, the Court's conclusion on custom does not resolve Columbia's second Motion for Summary Judgment.

C.     Alleged Constitutional Violations

Having determined that there is a genuine issue of material fact for trial on Columbia's alleged custom, the Court must also consider the alleged constitutional issues. Previously, the Court determined that Columbia was entitled to summary judgment because the Preachers had not demonstrated that there was a constitutional deprivation of their First Amendment rights and dismissed their § 1983 claim with prejudice. On appeal, the Fifth Circuit disagreed and found that there was a genuine issue of material fact as to the motivations of officers in their threat of arrest of the Preachers[10] on February 12, 2005, such that, the Fifth Circuit was unable to

---

[9]The Court notes, however, that, contrary to the Fifth Circuit's concern, the Preachers have never contended that they were entitled to stand with pedestrians behind the barricade on Pearl Street. One of the Preachers is heard stating on the DVD that the Preachers will pay if they wish to enter the festival; therefore, it appears that anyone behind the barricade had paid to enter, while the Preachers had not.

[10]The Fifth Circuit noted that the arrest of Russell could not cause a First Amendment injury to the other Preachers.

determine whether the officers' regulation was content-based or content neutral.

In their second Motion for Summary Judgment, Columbia contends that, based on additional evidence obtained since the Fifth Circuit's Opinion issued, "it is now clear that the actions of Officer Miles were not based on the content of [the Preachers'] signs, but rather were based on content neutral reasons." [Doc. No. 60, p. 1].  Columbia explains that Miles was motivated by safety concerns based on the report of a state trooper that the Preachers were standing on the white fog line and in the road.  According to Columbia, "the undisputed facts show that once Officer Miles arrived at the site and asked Allen Russell to move back . . ., Russell continued to resist him.  For this reason, . . . Miles felt that the resisting statute applied and arrested Russell." [Doc. No. 60, p. 2].   Accordingly, Columbia contends that the deposition testimony shows that Miles was motivated by the Preachers' failure to heed his warnings.

The Preachers, on the other hand, contend that the evidence is equally clear: whether Miles' actions are viewed under strict or heightened scrutiny, there is no compelling or significant government interest in "shutting down" the Preachers' First Amendment exercise, nor was this remedy appropriately tailored to any governmental interest.

First, according to the Fifth Circuit's Opinion, Columbia's focus on the arrest of Russell is incorrect because Russell's arrest could not cause a First Amendment injury to the Preachers.  Rather, it is Miles' threat of arrest of the other Preachers which resulted in the First Amendment injury to WWSPF as an organization.  245 Fed. Appx. at 342, 2007 WL 1655304 at *5 (On February 12, 2005, "the evidence, taken in the light most favorable to Plaintiffs, shows that Plaintiffs' First Amendment rights were restricted when Columbia's police officers threatened to arrest Plaintiffs if they did not leave the demonstration."); see id. at 342 n.5, *5 n.5 ("We do not consider Russell's arrest to be a First Amendment injury to Plaintiffs, because [WW]SPF, as an

organization, lacks standing to seek relief for injuries to a single member.").  Thus, even if Miles

had legitimate cause to arrest Russell, the issue is whether he was motivated by permissible

concerns to cause the remaining Preachers to end their demonstration by his threat of arrest.

Second, having again reviewed the evidence in this matter, including the deposition

testimony, the Court finds that there remain genuine issues of material fact for trial as to whether

Miles's motivations were content-neutral or content-based.  Although Miles states in his

deposition that he was motivated by safety concerns, this Court is still called upon to make a

credibility determination as to whether those concerns extended to the Preachers who were

threatened with arrest.  The Court finds that there remain genuine issues of material fact for trial

as to Miles's motivation, particularly in light of his statements to the Preachers at their first

encounter in December 2003.[11]

Accordingly, Columbia's Motion for Summary Judgment is also DENIED.

## III.   CONCLUSION

For the foregoing reasons, the parties' second cross motions for summary judgment are

DENIED.

MONROE, LOUISIANA, this 3rd day of April, 2008.

ROBERT G. JAMES
UNITED STATES DISTRICT JUDGE

---

[11]The Court need not reach the Preachers' remaining arguments because it has already
determined that there is a genuine issue of material fact for trial whether they can establish
municipal liability.  The Preachers must establish that a municipal custom was the moving force
behind a constitutional violation.  They cannot obtain summary judgment merely by showing a
constitutional violation.