RECEIVED
IN MONROE, LA

NOV 7 - 2008

ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA

**UNITED STATES DISTRICT COURT**

**WESTERN DISTRICT OF LOUISIANA**

**MONROE DIVISION**

| | |
|---|---|
| **WORLD WIDE STREET PREACHERS'** | **CIVIL ACTION NO. 05-0513** |
| **FELLOWSHIP, ET AL.** | |
| | |
| **VERSUS** | **JUDGE ROBERT G. JAMES** |
| | |
| **TOWN OF COLUMBIA, LOUISIANA** | **MAG. JUDGE JAMES D. KIRK** |

## OPINION

On March 22, 2005, Plaintiffs World Wide Street Preachers' Fellowship ("WWSPF") and

Kenneth Coleman, Sr. ("Coleman") filed suit against Defendant Town of Columbia, Louisiana

("Columbia"), under 42 U.S.C. § 1983 and the First and Fourteenth Amendments to the United

States Constitution.

A bench trial was held on October 7, 2008. Following trial, the Court took the case under

advisement. The parties submitted the case on the record without supplemental briefs.

The Court hereby enters the following findings of fact and conclusions of law. To the extent

that any finding of fact constitutes a conclusion of law, the Court hereby adopts it as such, and to the

extent any conclusion of law constitutes a finding of fact, the Court hereby adopts it as such.

### I.    INTRODUCTION

WWSPF and Coleman allege that Columbia violated their constitutional rights of free

exercise of religion, freedom of speech, and freedom to peaceably assemble by arresting and

threatening to arrest them for displaying anti-abortion signs while demonstrating in Columbia. The

instant suit arises out of the events of February 12, 2005, in which a member of the WWSPF was

arrested by a Columbia police officer and others were threatened with arrest while they were

demonstrating at the intersection of Church Street and Highway 165. WWSPF and Coleman brought suit only against Columbia, not against the arresting officer, and seek declaratory and injunctive relief, attorney's fees, and costs.

The Court has previously ruled that, in order to prevail, WWSPF and Coleman must establish both that their constitutional rights were violated and, pursuant to *Monell v. Dep 't of Soc. Servs.,* 436 U.S. 658, 694 (1978), that the violation was the result of Columbia's official policy or custom, or the act of an official policy maker for Columbia. The Court has considered the events before and after February 12, 2005, in order to reach a reasoned decision as to whether a policy was in place on the date of the incident at issue.

## II. FINDINGS OF FACT[1]

Plaintiff WWSPF is an organization of street preachers. Plaintiff Coleman and his former pastor, Allen Russell ("Russell"), are members of WWSPF.[2]

Members of the WWSPF, including Coleman, carry signs reflective of their religious beliefs, including the beliefs that women cannot be ministers and that abortion is a sin. Some of these signs are textual. Some display alleged pictures of aborted fetuses.

In December 2003, the Preachers[3] began demonstrating in Columbia. Columbia has no

---

[1]Although the Court does not usually include procedural history in its findings of fact, the Court finds it appropriate to do so in this case, so that the actions of the parties can be viewed in the context of the Court's rulings.

[2]Coleman resides in Winnsboro, Louisiana; Russell formerly resided in Winnsboro, where he was pastor of Liberty Baptist Church. Russell and his wife now reside in Pennsylvania.

[3]Although it is the Court's understanding that only men are members of the WWSPF, when referring to the demonstrators, the Court uses the term "Preachers" for ease of reference to include both members of the WWSPF, their female supporters, and others demonstrating with the WWSPF.

policies regarding public demonstrations, the display of signs, assembly in public areas, or street preachers.[4] No group or individual is required to obtain a permit merely to demonstrate.[5]

When demonstrating in Columbia, the Preachers preferred to stand near the intersection of State Highway 165 and Church Street ("the intersection") because they could preach and display their signs to passing motorists, who were forced to slow down or stop for a traffic signal. On each side of Highway 165, there was a shoulder of approximately eight feet from the white line to the edge of the pavement ("the shoulder").

On December 27, 2003, the Preachers were demonstrating at the southwest corner of the intersection. On that day, Russell called police and complained that a truck had "swerved" at them. The dispatcher for the Caldwell Parish Sheriff's Department ("Sheriff's Department") notified Columbia police officers.[6] Officer Robert Miles ("Miles") and another officer arrived on the scene and spoke with the Preachers about the incident. During their conversation with Russell, both officers commented that they agreed with the Preachers' anti-abortion message, but Miles asked if the Preachers had "to hold up those . . . pictures" of aborted fetuses. He commented further that he did not agree with the pictures and that they were "offensive." Russell was also cautioned that the Preachers should stay off the highway. The officers left, and the Preachers continued demonstrating.

On December 30, 2003, the Preachers returned to the southwest corner of the intersection to demonstrate. On that date, Chief of Police Doug Crockett ("Chief Crockett") stopped and spoke

---

[4]In his September 28, 2007 deposition, Chief of Police Douglas Crockett testified that he had been elected in 1966 and that there had never been any policies on these issues during his entire forty-one-year tenure.

[5]A group or individual who wishes to have a street or streets closed for a parade or demonstration must obtain approval from the Town Council.

[6]Columbia does not have its own dispatcher.

3

with the Preachers. Chief Crockett told Russell that he did not mind their protesting, but asked that the Preachers put away their signs.[7] When Russell asked if there was a law against his holding a sign, Chief Crockett informed Russell that he would check the law. Russell said that the Preachers would continue demonstrating with their signs until an officer showed him a law rendering their activities illegal. Chief Crockett left the scene and did not return. Chief Crockett later learned that demonstrators could stand on a public road with signs.[8]

On May 15, 2004, the Preachers demonstrated on the sidewalk between the First United Methodist Church ("the FUMC") and Church Street during and immediately following Sunday church services. The Preachers held textual signs and preached against women ministers. The FUMC had a female minister at the time. One church member became enraged and started a minor physical altercation with one of the Preachers. Someone from the FUMC contacted the Sheriff's Department, and officers were dispatched. Although the Preachers were told that they could file charges against the church member, no one was arrested or charged with a crime. The Preachers continued demonstrating after the incident.

The Preachers demonstrated in Columbia again on December 11, 2004. Although the Sheriff's Department received a citizen complaint, no officer was dispatched.[9]

---

[7]Chief Crockett died before trial. Pursuant to Federal Rule of Evidence 804(a)(4) & 804(b)(1), Chief Crockett's deposition testimony has been admitted into evidence in lieu of live testimony.

[8]In his deposition, Chief Crockett testified that he wanted to know if the Preachers (or any other demonstrators) "could stand on the highway with [signs]" of any type, not just signs picturing aborted fetuses. [Exhibit 114, p. 10].

[9]The Preachers objected at trial to the admission of Columbia's Exhibit 118, which consists of an affidavit from the Assistant Chief Deputy for the Sheriff's Department and computer logs of calls received about the Preachers. For the reasons stated in the Conclusions of Law, the Court denies the objection and finds that Exhibit 118 is admissible.

On February 12, 2005, the Preachers demonstrated in Columbia on the southeast corner of the intersection in front of the FUMC. At that time, the southwest corner of the intersection was under excavation as part of the relocation and reconstruction of Highway 165. The FUMC owns the sidewalk in front of the church, as well as the grass, dirt, and gravel areas adjacent to the shoulder of Highway 165. The Preachers, at various times that day, stood on FUMC's property, as well as the shoulder of the highway.

During the demonstration on February 12th, State Trooper John Wyles ("Wyles"), who lives in Columbia, passed by and observed the Preachers standing on the shoulder of Highway 165. Wyles, who was off duty, called the Caldwell Parish Sheriff's Department and asked that an officer move the Preachers off the roadway. Wyles was concerned that the Preachers' location was a public safety issue because northbound traffic would be distracted by the demonstration, which was approximately 30 feet south of a traffic light. Wyles would have stopped and moved the Preachers himself if he had been on duty. He had moved other groups, such as cheerleaders holding car washes, off Highway 165 when he felt there was a safety issue.

Columbia also received complaints on February 12th from the FUMC.

Based on the calls from Wyles and the FUMC, Miles and another officer, Michael Etheridge, were dispatched to the Preachers' demonstration. The officers stopped at the Preachers' demonstration and told the Preachers that they needed to leave the intersection, but the officers had to attend to another call and did not stay to see if the Preachers complied. When the officers later returned to the intersection, the Preachers were still demonstrating and were then on the FUMC's property.[10] Miles told Russell several times that the Preachers were on church property.[11] Russell

---

[10]In its opinion, the United States Court of Appeals for the Fifth Circuit stated: "Some demonstrators were standing on [FUMC's] property, although it is unclear if they had been

5

did not believe that the Preachers were standing on private property. During the confrontation, Miles pointed to the area adjacent to the shoulder and stated that "this is the church property and they don't want you here." He then pointed to the shoulder and stated, "this is state property and they don't want you here." Miles told Russell, he had "five minutes to get off this parking lot." After Russell refused to leave, Miles arrested him. He then turned to the four people with Russell and said, "all y'all want to go too?" A few minutes later, Miles told the other Preachers to "put that sign away and y'all get off this parking lot or I will arrest every one of you." When Mrs. Russell questioned who owned the property up to the shoulder, Miles incorrectly replied, "State does. You cannot picket, boycott on State property or right of way."

Miles did not consult with Chief Crockett prior to arresting Russell,[12] threatening the arrest of the other Preachers, or determining what statutes Russell violated. Miles believed that Russell's conduct "fit" the statute for resisting an officer, LA. REV. STAT. § 14:108. After he arrested Russell, he reviewed the Louisiana criminal statutes and concluded that Russell was also in violation of LA.

_____

standing there the entire time or had moved there after three police cars parked on the shoulder." *World Wide Street Preachers Fellowship v. Town of Columbia,* No. 06-30294, 245 Fed. Appx. 336, 340, 2007 WL 1655304, at *2 (5th Cir. June 6, 2007). However, it is undisputed, based on the complete record, including the testimony of Russell and Coleman, that the Preachers stood in the gravel and grass areas belonging to the FUMC prior to the arrival of police officers.

[11]Although this was not depicted in the video, Russell admitted at trial that none of the videos taken by the Preachers depict the entire incident. He also testified that videos were regularly taped over when there was no interaction with the police, explaining why there were not videos of the other days when Columbia police were not dispatched.

[12]Miles's arrest of Russell could not cause a First Amendment injury to the Preachers. *See* 245 Fed. Appx. at 342, 2007 WL 1655304, at *5 (On February 12, 2005, "the evidence, taken in the light most favorable to Plaintiffs, shows that Plaintiffs' First Amendment rights were restricted when Columbia's police officers threatened to arrest Plaintiffs if they did not leave the demonstration."); see id. at 342 n.5, *5 n.5 ("We do not consider Russell's arrest to be a First Amendment injury to Plaintiffs, because [WWSPF], as an organization, lacks standing to seek relief for injuries to a single member.").

6

REV. STAT. § 32:143 (stopping or standing or parking in specified areas) and LA. REV. STAT. §

14:326 (processions, marches or demonstrations without a permit). Miles's Affidavit of Probable

Cause for Arrest Without a Warrant states, in pertinent part, that Miles

> observed a group of people holding signs, and pictures, at the corner of Church St.
> and U.S. HWY 165 in Columbia. I then approached the Group and advised them that
> they were causing a disturbance with their actions, and pictures, and that [sic] were
> on the state right of way, and that they needed to leave the area. At that time a [sic]
> unidentified W/M approached me and stated that they did not have to move back, or
> leave. . . . The group didn't have any permit to be on the right of way, and they were
> to [sic] close to the flashing beacon (red light), and also they didn't have a permit
> issued through mayor's court. The above listed subject [Russell] was advised his
> rights per Miranda and placed under arrest for the violations listed above, and his
> refusal to comply with the orders given.

Russell was charged with a violation of each of these statutes and was jailed over the weekend until

he could make bail. The charges have never been prosecuted.

On February 18, 2005, counsel for the Preachers overnighted a letter to Chief Crockett

complaining that the actions of Columbia's officers on February 12th violated the Preachers'

constitutional rights.

Chief Crockett provided the letter to James Carroll ("Carroll"), whose law firm represents

Columbia. On March 16, 2005, Carroll responded in a letter to the Preachers' counsel. Carroll

pointed out that Russell and the others were demonstrating on the property of FUMC, within 24

inches of the white line of Highway 165, within 20 feet of a traffic light, and in a construction zone.

Carroll stated that Miles was within his rights to ask the Preachers to relocate their demonstration.

Carroll also stated that the Preachers would need to obtain a permit to demonstrate pursuant to state

law.

On March 22, 2005, the Preachers filed the instant suit.

On March 23, 2005, the Court issued a temporary restraining order, enjoining Columbia from

interfering with the Preachers' First Amendment activities until a preliminary injunction hearing could be held.

On March 25, 2005, the Preachers returned to the same intersection in front of the FUMC to demonstrate and hold signs with religious text, such as "God Hates the Easter Bunny," and with pictures allegedly depicting an aborted fetus. After receiving several calls, the female pastor of the FUMC, Pam Roy ("Roy"), approached the Preachers and asked them to leave.[13] The Preachers refused to leave and began preaching to her regarding their beliefs, among others, that women cannot be ministers, should not cut their hair short, and should not wear pants. Miles and Officer Clay Bennett ("Bennett") were dispatched to the scene. Bennett observed the Preachers standing on the shoulder of Highway 165 and on the church property. He asked the Preachers to leave. The Preachers eventually ended their demonstration and dispersed.

Shortly after this incident,[14] Russell asked Bennett about procedures for obtaining a demonstration permit. Bennett erroneously explained that the Town Council would have to vote on the permit to demonstrate, just as they had to do for any kind of parade or festival.

On April 1, 2005, the Court held a hearing on the Preachers' request for a preliminary injunction. The parties reached an agreement, among others, that the Preachers would not demonstrate on the property of the FUMC.

---

[13]Although Reverend Roy testified that the demonstration took place on Good Friday, based on the other evidence, the Court finds she was mistaken about the date. The Court finds her testimony was otherwise credible.

[14]There is some confusion as to the date of this conversation. There was testimony that the conversation took place on the Saturday after Good Friday, but the transcript of the recorded conversation [Exhibit 213] is dated March 26, 2005 (the day after the Preachers left a demonstration at the Church street intersection). However, the Court finds that this particular date has no significance to its analysis.

8

However, on April 2, 2005, Russell and members of the WWSPF from Indiana and Texas traveled by bus to Columbia to demonstrate. These out-of-state members stood at the intersection on the FUMC property and on the shoulder of Highway 165. On this occasion, Russell testified that he was "with [the Preachers] on the bus but . . . was not with them on the street." He admitted that he had "agreed not to be in [the intersection]," so he did not want to "violate [his] agreement" on behalf of Liberty Baptist Church (the church he pastored in Winnsboro) and "stayed on the bus." However, Carroll, who saw the demonstration, testified credibly and without rebuttal that Russell was standing on top of the bus and that the bus had signs and pictures on its windows.

On Thursday, April 7, 2005, and Good Friday, April 8, 2005, the Preachers again returned to Columbia to demonstrate. On Thursday, they stood on the private property of the FUMC. On Friday, they stood on state property. On both occasions, the Preachers demonstrated without police intervention, despite complaints from citizens.

On April 10, 2005, the Preachers returned to Columbia and again demonstrated without incident, despite citizen complaints to the Sheriff's Department.

On May 5, 2005, the Court issued an Opinion, granting in part and denying in part the Preachers' request for a preliminary injunction. The Court enjoined Columbia from enforcing the standing and permit statutes against the Preachers and further enjoined Columbia from enforcing the resisting statute as it had been applied to the Preachers.

In late May 2005, the River Boat Days Festival was to be held in Columbia. The Preachers notified Columbia that they intended to demonstrate during the Festival.[15] Several days before the

---

[15]Carroll suggested that Columbia offer the Preachers a free booth at the Festival and was told that the Preachers refused the booth. Russell was adamant that they were never offered a booth. Because the Court finds both witnesses credible, it appears that the offer was not communicated to Russell. It is unclear who called Columbia for the Preachers, and who with the

Festival, Chief Crockett contacted Mitch Bratton ("Bratton"), the Chief of Police for Grayson, Louisiana, another town in Caldwell Parish. Chief Crockett told Bratton that the Preachers had a right to demonstrate at the festival.[16] Bratton and Chief Crockett had heard "street talk" suggesting that some members of the public might interfere with the Preachers' demonstration. Chief Crockett asked Bratton to assist with security for the Preachers.

On May 21, 2005, the River Boat Days Festival was held. During the festival, several of the streets running perpendicular to Highway 165 were barricaded, including the east end of Pearl Street, the street intersecting Highway 165 at the base of the Columbia bridge. The east end of Pearl Street was a main entrance to the festival, but pedestrians were not permitted to remain standing in the intersection. Additionally, officers had to move the barricade at times to allow antique cars in and out of the Pearl Street entrance for the car show at the festival.

On the day of the festival, the Preachers wanted to demonstrate near the Pearl Street intersection at the base of the bridge. Chief Crockett asked the Preachers to stand on the sidewalk along the bridge. While Russell denied that there was any agreement, Coleman testified credibly that there had been some compromise that the Preachers would stand on the sidewalk along the bridge. It is undisputed that the Preachers demonstrated on the bridge at this point without any confrontation with officers.

When Bratton arrived, he was told by Chief Crockett that the Preachers agreed to stay on the Columbia Bridge and also to cease their demonstration when a funeral procession went by later in the day. During the Preachers' initial demonstration, officers formed a blockade between the

Festival spoke with the Preachers' representative.

[16]Although Chief Crockett's statements to Bratton are arguably hearsay, no objection was made to the Court's consideration of these statements.

10

Preachers and the public to prevent any altercations. At the same time, officers were monitoring traffic on the bridge because the west end of Pearl Street and Highway 165 were open, and there was a blind spot coming into that intersection.

When the funeral procession came through, the Preachers, as agreed, stopped their demonstration. When the Preachers returned, however, some Preachers refused to resume their demonstration on the bridge and instead wanted to demonstrate in or closer to the Pearl Street intersection. Coleman testified that the officers said that they could stand within twenty-five (25) feet of the intersection, but then began to push them further up the bridge. During the exchange, some police officers can be heard stating that the Preachers were required to stand twenty-five (25) feet from the intersection under "state law."[17] The Preachers and Columbia police officers, as well as other law enforcement officers from the Sheriff's Department and Grayson, became engaged in confrontations where officers physically pushed some of the Preachers up the bridge, to a point that appears to be further than twenty-five (25) feet. Coleman and Russell were ultimately arrested.[18]

In November 2005, the parties filed cross-motions for summary judgment.

On December 3, 2005, the Preachers again demonstrated in Columbia. Despite a citizen complaint to the Sheriff's Department, no officer was dispatched.

On January 25, 2006, the Court issued a Ruling and Judgment granting Columbia's motion

---

[17]The standing statute, which this Court previously determined to be inapplicable to persons, requires that a vehicle be more than twenty (20) feet from an intersection. It is unclear to which state law, if any, officers referred. Chief Crockett did not testify that state law required the Preachers to stand twenty-five (25) feet from the intersection, but that the Preachers and Columbia had reached an agreement to that effect.

[18]"Plaintiffs state in their briefing that the May 21, 2005, events are not part of this lawsuit." 245 Fed. Appx. at 342, 2007 WL 1655304, at *5.

11

for summary judgment and denying the Preachers' motion for summary judgment.

On February 23, 2006, the Preachers appealed to the United States Court of Appeals for the Fifth Circuit.

On April 8, 2006, two of the Preachers contacted the Sheriff's Department to complain that someone threw a beer can at them and also pointed a gun at them while they were protesting on the Columbia Bridge. An officer was dispatched to investigate.

On July 2, and November 3, 2006, the Sheriff's Department received complaints that the Preachers were demonstrating in front of the FUMC or on its property. Officers were dispatched, but the Preachers do not allege any wrongful actions by Columbia on these dates.

On June 6, 2007, the Fifth Circuit reversed this Court's grant of summary judgment to Columbia, affirmed its denial of the Preachers' motion for summary judgment, and remanded for further proceedings. *See World Wide Street Preachers Fellowship v. Town of Columbia,* No. 06-30294, 245 Fed. Appx.336, 2007 WL 1655304 (5th Cir. June 6, 2007).[19]

In August 2007, after the relocation of Highway 165 was complete, the Columbia Bridge was imploded. The intersection of Highway 165 and Church Street where the Preachers previously stood

---

[19]The Fifth Circuit held that

there is simply too much uncertainty about the motivations of the governmental action to determine whether a First Amendment violation took place. . . . there is a fact issue regarding whether the officers were actually motivated by the content of [the Preachers'] demonstration, which prevents summary judgment on the issue of whether the restriction was content-based or content-neutral. Without knowing the motivation for the restriction, we cannot determine which test to apply-strict scrutiny or a lesser level of scrutiny. Summary judgment on this issue was, thus, inappropriate.

245 Fed. Appx. at 348-49, 2007 WL 1655304, at *10.

12

no longer exists.

On remand, in November 2007, the parties filed second cross-motions for summary judgment, [Doc. Nos. 60 & 61] which this Court denied. [Doc. Nos. 82 & 83].

On October 7, 2008, a one-day bench trial was held. The parties agreed that the matter had been fully briefed and that all evidence had been submitted.

## III.    CONCLUSIONS OF LAW

### A.    Admissibility of Exhibit 118

As a preliminary matter, Plaintiffs object to the admissibility of Columbia's Exhibit 118, the affidavit of Assistant Chief Deputy Beckie Ledbetter of the Sheriff's Department and accompanying computer logs identifying calls received directly or through 911 about the Preachers. The log records identifying the complainant, the date of the complaint, the substance of the complaint, and whether an officer was dispatched. Plaintiffs object that Exhibit 118 contains inadmissible hearsay and is not relevant to the case.

The Court finds the records are admissible pursuant to Federal Rules of Evidence 803(6) and 803(8).[20] First, the Court finds that the logs are admissible under the business records exception,

---

[20]Rule 803(6) provides an exception to the hearsay rule for business records:

A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all shown by the testimony of the custodian or other qualified witness, or by certification that complies with Rule 902(11), Rule 902(12), or a statute permitting certification, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

13

FED. R. EVID. 803(6). The log of calls were kept in the ordinary and regular course of the Sheriff Department's business. FED. R. EVID. 803(6) ("The term 'business' . . . includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit."). The logs were made at or near the time of the call by a Sheriff's Department employee and were attested to by the custodian. Finally, it was the regular practice of the Sheriff's Department to log calls that come in to the dispatcher and to keep a record of whether an officer was dispatched. *See Radloff v. City of Oelwein, Iowa*, 380 F.3d 344, 348 (8th Cir. 2004) (holding no "error in the District Court's decision to admit this police-activity log as a record kept in the ordinary course of the Police Department's business."); *Rosario v. Amalgamated Ladies' Garment Cutters' Union, Local 10*, 605 F.2d 1228, 1250-51 (2d Cir. 1979) (holding the trial court did not err by admitting into evidence under Rule 803(6) a complaint report made out at the police station).

The logs are also admissible under the public records exception, FED. R. EVID. 803(8) because they are data compilations of the Sheriff's Department setting forth the activities of the office and matters observed by the dispatcher pursuant to a duty imposed by law.

———————————

FED. R. EVID. 803(6).

Rule 803(8) provides an exception to the hearsay rule for public records:

> Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel, or (C) in civil actions and proceedings and against the Government in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.

Fed. R. Evid. 803(8).

14

The Court further notes that it has admitted and considered the records, not for the truth of the complaints allegedly made by citizens[21] to the dispatcher, but for the purpose of showing, as admitted by Russell, that the Preachers demonstrated in Columbia on several occasions without police intervention. These records show that on many occasions police officers were not dispatched, even though some type of complaint was received by the Sheriff's Department dispatcher.

The Court also finds that Exhibit 118 is relevant. *See* FED. R. EVID. 401 ("'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."). The call logs are relevant to the issue of the motivation of Miles (since there are instances before and after February 12th when Miles did not interfere with the Preachers' First Amendment activities) and to the issue of municipal liability, i.e., whether there was a widespread custom of applying inapplicable statutes to the Preachers' conduct.

## B. Freedom of Speech, Free Exercise of Religion, and Freedom of Assembly

The First Amendment provides the Preachers the right to freedom of speech, the right to free exercise of religious expression, and the right to freedom of assembly. *See McDaniel v. Paty*, 435 U.S. 618, 625 (1978) (religious expression); *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460-61 (freedom of assembly); *Madsen v. Women's Health Ctr.*, 512 U.S. 753, 773 (1994) (First Amendment protection on free speech includes signs with images).

In its opinion, the Fifth Circuit set forth the constitutional standards for reviewing these

---

[21]The witness statements reflected in the logs are arguably admissible under the hearsay exception for present sense impression, FED. R. EVID. 803(1). However, Columbia asked the Court to consider the statements not for the truth of the witnesses' statements, but for the fact that officers were not dispatched in response to every complaint. The Court agrees, and it has not considered the truth of the witnesses' statements, other than complaints made by the Preachers.

15

claims:

> Although not identical, the constitutional standards for speech, religion, and assembly are similar. Turning first to freedom of speech, we note that the Supreme Court has set forth two separate tests to determine whether a governmental restriction on speech violates the First Amendment-strict scrutiny and intermediate scrutiny. The key to deciding which test to apply to the government's conduct is whether the restriction was content-based, in which case the strict scrutiny test applies, or content-neutral, in which case we apply intermediate scrutiny.

> Strict scrutiny, as applied to content-based restrictions of speech, requires the government to show that the restriction at issue is narrowly tailored to promote a compelling governmental interest. *United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 813, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000). If a less restrictive alternative is available, the governmental restriction cannot survive strict scrutiny. *See id.* Intermediate scrutiny, on the other hand, requires the government to demonstrate that: (1) the restriction is within the constitutional power of the government; (2) the restriction furthers an important or substantial governmental interest; (3) the governmental interest is unrelated to the suppression of free expression; and (4) the incidental restriction on First Amendment freedoms is no greater than is essential to the furtherance of that interest. *United States v. O'Brien*, 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968); *Horton v. City of Houston*, 179 F.3d 188, 194 (5th Cir. 1999). Courts often shorten this inquiry into whether the restriction is narrowly tailored to serve a significant government interest and leaves open alternative channels of communication. *See Horton*, 179 F.3d at 194. In the context of intermediate scrutiny, "narrowly tailored" does not require that the least restrictive means be used. *Ward v. Rock Against Racism*, 491 U.S. 781, 798, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989). Rather, so long as the restriction promotes a substantial governmental interest that would be achieved less effectively without the restriction, it is sufficiently narrowly tailored. *Id.* at 799, 109 S.Ct. 2746.

> The principal inquiry in determining whether a restriction is content-based or content-neutral, and thus whether strict or intermediate scrutiny should be applied, is whether the government has adopted the restriction of speech because of the government's disagreement with the message conveyed. *Id.* at 791, 109 S.Ct. 2746. "A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Id.* (holding a regulation is content-neutral as long as it is justified without reference to the content of the regulated speech). Consequently, in order to determine which test should be applied to Columbia's restriction of Plaintiffs' speech-strict scrutiny or intermediate scrutiny-we must decide whether Columbia's restriction was based on the content of Plaintiffs' speech or rather was content-neutral.

16

The constitutional tests for whether governmental action unconstitutionally infringes on the free exercise of religion and freedom of assembly are similarly dependent on whether the restriction was motivated by the nature of the conduct that is restricted. With respect to the free exercise of religion, if the object of a law is to infringe upon or restrict practices because of their religious motivation, the law is invalid unless it is justified by a compelling interest and is narrowly tailored to advance that interest. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993). In other words, a restriction of religious practices because of their religious nature must survive strict scrutiny. *See id.* at 546, 113 S.Ct. 2217. However, a law that is neutral and of general applicability need not be justified by a compelling governmental interest, even if that law has the incidental effect of burdening a particular religious practice. *Id.* at 531, 113 S.Ct. 2217. Thus, the motivation for the restriction on the exercise of religion must be established before the restriction can be legally analyzed.

Likewise, the Supreme Court has held that an infringement on the right to associate for expressive purposes can be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms. *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984); *see also La. Debating & Literary Ass'n v. City of New Orleans*, 42 F.3d 1483, 1498 (5th Cir.1995) (applying strict scrutiny to restriction on associational freedoms). Therefore, the restriction on freedom of assembly must also be unrelated to the purpose of the assembly.

Given the above tests for violations of the First Amendment rights of free speech, free exercise of religion, and free assembly, it is clear that the motivation for the restriction at issue is key to determining which constitutional standard should be applied.

245 Fed. Appx. at 344-45, 2007 WL 1655304, at *5-6.

### 1. Miles's Motivation on February 12, 2005

Having heard the testimony of Miles, Wyles, Russell, Mrs. Russell, and Coleman, the Court finds that Miles was not motivated by the content of the Preachers' speech, the exercise of their religion, or the purpose of their assembly on February 12, 2005, when he arrested Russell and threatened the arrest of the other Preachers and their supporters. Although Miles made comments to the Preachers during his first interaction with them about the pictures they displayed, neither Miles

17

nor any other Columbia officer stopped their demonstrations until February 12, 2005.[22] On that date, it was Wyles, who had no prior or subsequent interaction with the Preachers, who requested police intervention because it was his opinion that the Preachers' demonstration at that particular location posed a threat to public safety. Miles had also received a complaint from the FUMC about the Preachers demonstrating on its property. While Miles later learned that the Preachers had the right to demonstrate on the shoulder of Highway 165, he believed at the time that "the State," through Trooper Wyles, would not permit the Preachers to demonstrate on the shoulder, regardless of their message. He also knew, correctly, that FUMC had not given the Preachers permission to demonstrate on its private property and had, in fact, complained about the Preachers' demonstrations on its property. Miles was motivated, not by the content of the Preachers' speech, exercise of religion, or reason for assembly, but by his interpretation of the dispatcher's request from Wyles and by the directives of the private property owner, the FUMC.

## 2. Intermediate Scrutiny

Because the Court finds that Miles did not act based on an improper motive, the Court reviews his actions under the intermediate scrutiny standard. In this inquiry, the Court finds that Miles's restriction of the Preachers' speech, free exercise, and assembly rights was not "narrowly tailored to serve a significant government interest and [did not] leave[] open alternative channels of communication." *See Horton*, 179 F.3d at 194.

Miles offered the Preachers only one option on February 12th to avoid arrest: end their demonstration and leave. Miles could have addressed both the rights of the FUMC as property

---

[22]Indeed, every officer, including Chief Crockett, either commented to the Preachers or testified under oath that he supported the Preachers' anti-abortion message.

18

owner and the safety concerns of Wyles by moving the Preachers further away from the intersection, but allowing them to demonstrate on the shoulder of Highway 165. Alternatively, he could have suggested another public location for their demonstration. Miles later suggested to the Preachers on several occasions that they could demonstrate on the courthouse grounds, but he did not offer this alternative until after the February 12th incident. In short, the restriction imposed by Miles, as an officer for Columbia, was neither narrowly tailored, nor did it leave open alternative channels of communication.

Therefore, the Court finds that Miles's actions violated the First Amendment rights of the Preachers on February 12, 2005. Because the WWSPF and Coleman brought suit only against Miles's municipal employer, Columbia, the Court must now determine whether Columbia is liable for Miles's constitutional violation. *See Coon v. Ledbetter*, 780 F.2d 1158, 1161 (5th Cir. 1986). ("[I]llegal behavior can [not] be assumed to have resulted from an official policy.").

## C.   Municipal Liability under § 1983

It is well-settled that a person or entity alleging constitutional violations must assert them through 42 U.S.C. § 1983. That statute, which is derived from § 1 of the Civil Rights Act of 1871, provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.

"[P]roper analysis requires us to separate two different issues when a section 1983 claim is

asserted against a municipality: (1) whether plaintiff's harm was caused by a constitutional violation, and (2) if so, whether the City is responsible for that violation." *In Collins v. City of Harker Heights*, 503 U.S. 115, 120 (1992). A plaintiff cannot rely on respondeat superior or vicarious liability principles. Rather, he must show that his constitutional injury was the result of official policy, custom, or the act of an official policy maker. *Monell*, 436 U.S. at 694; *see also Williams v. Kaufman County*, 352 F.3d 994, 1013 (5th Cir. 2003) ("The law is well-established that a municipality . . . can be held liable for its policies and customs that engender constitutional deprivation, but that it cannot be held liable for the actions of its non-policy-making employees under a theory of respondeat superior.").[23]

"Proof of municipal liability sufficient to satisfy *Monell* requires: (1) an official policy (or custom), of which (2) a policy maker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose 'moving force' is that policy (or custom)." *Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir. 2002) (citing *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001)).

In its previous ruling on the parties' second cross-motions for summary judgment, the Court identified four ways in which the Preachers may meet their burden: (1) an officially adopted municipal policy or custom; (2) a practice that, though not officially adopted, is so widespread as to

___

[23]The Fifth Circuit noted on appeal in this matter that the parties did not raise or brief the issue of municipal liability; "therefore, our focus in this case is on the actions of the officers, which is what the parties have argued." 245 Fed. Appx. at 345, 2007 WL 1655304 at *6. However, the Fifth Circuit was clear that § 1983 municipal liability could not be based on respondeat superior or vicarious liability principles. *Id.* (citing *Collins v. City of Hacker Heights*, 503 U.S. 115, 123, 112 S.Ct. 1061, 117 L. Ed.2d 261 (1992)).

20

fairly represent municipal policy or custom; (3) the single incident exception; and (4) failure to train. The Court found that the undisputed evidence showed that the Preachers had raised a genuine issue of material fact for trial under only the second method. Under this method, the "persistent, widespread practice" of the municipal employees must be "so common and well settled as to constitute a custom that fairly represents municipal policy. Actual or constructive knowledge of such custom must be attributable to the governing body of the municipality or to an official to whom that body had delegated policy-making authority." *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984) (en banc); *see also Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 403 (1997) ("[A]n act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law.") (citing *Monell*, 436 U.S. at 690-91) (other citations omitted); *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) ("Relying on the language of § 1983, the Court has long recognized that a plaintiff may be able to prove the existence of a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law. . . . That principle, which has not been affected by *Monell* or subsequent cases, ensures that most deliberate municipal evasions of the Constitution will be sharply limited.") (citations and internal quotation marks omitted); *cf. Palmer v. City of San Antonio*, 810 F.2d 514, 516 (5th Cir. 1987) (Proof of random acts or isolated events are insufficient to establish custom.)

The Preachers identified Columbia's alleged widespread practice as a policy of limiting their ability to exercise their First Amendment rights by resorting to the use of inapplicable statutes. In their previously filed brief, the Preachers pointed to the following evidence to support municipal

21

liability:

- On December 27, 2003, Miles and another officer had a "long discussion" with the Preachers about the content of the Preachers' signs;

- On December 30, 2003, Chief Crockett attempted "to stop the Preachers from displaying their signs";

- On February 18, 2005, counsel for the Preachers wrote a letter to Chief Crockett, detailing First Amendment law and the Preachers' claims;

- On March 16, 2005, counsel for Columbia responded to the February 18, 2005 letter, stating that officers were within the law to arrest Russell and that any further demonstrations at the February 12, 2005 location would require permission of the landowner and a permit;

- On March 26, 2005, Columbia police officer, Clay Bennett, told Russell's wife, Robin Russell, that the Preachers had to obtain a permit before returning to demonstrate;

- On May 21, 2005, Russell and Coleman were arrested after they refused to move away from the intersection of Highway 165 and Pearl Street for alleged violations of state statute.

The Court finds this evidence and that adduced at trial insufficient to render Columbia liable for Miles's violation of the Preachers' First Amendment rights. With regard to events of December 2003, the Court finds that, on both occasions, the Preachers were permitted to continue their demonstrations, were not arrested, threatened with arrest, required to relocate or required to leave. While Chief Crockett did ask the Preachers to put away their signs, when they refused, he took no action against them, nor did he have his officers do so, and he later learned that it was lawful to hold signs on the highway shoulder. No widespread practice of limiting the Preachers' First Amendment rights can be premised on the discussion, i.e., speech, between these officers and the Preachers.

The Preachers cite to no other events or actions prior to February 12th to suggest that Columbia had a widespread practice of restricting their rights through inapplicable statutes. In fact,

22

the evidence shows that the Preachers demonstrated on other occasions before February 12th without being arrested, threatened with arrest, and without being required to end their demonstration.[24] Prior to February 12, 2005, the practice of officers appeared to be to allow the Preachers to continue their demonstrations, despite the officers' concerns about signs near the highway and the graphic nature of the pictures.[25]

On the date of the incident at issue, February 12, 2005, there is also no evidence of a widespread practice of using inapplicable statutes to restrict the Preachers' First Amendment rights. Miles did not consult with Chief Crockett or any other Columbia officer or official prior to threatening the arrest of the Preachers; prior to or after arresting Russell; or prior to or after deciding under which statutes to charge Russell. He believed he had a basis to arrest Russell for resisting his directive and believed that he had the right to require the other Preachers to leave because there was a safety issue of their being too close to the highway at that particular location and because the FUMC did not want the Preachers on its property. Miles charged Russell with the violations of the standing and permit statues after he personally consulted the statutes and believed that these "fit" Russell's conduct. While Miles was incorrect about state law, that fact alone does not create a "widespread practice."

Likewise, as this Court has previously stated, Chief Crockett's failure to investigate Miles's

---

[24]Notably, on May 15, 2004, the Preachers continued their demonstration on and near the property of the FUMC, even after the physical altercation with the FUMC church member.

[25]Although the Preachers state that their First Amendment rights would have been violated earlier if they had succumbed to the request of Columbia police officers, they do not allege that they were threatened with arrest or other sanctions or that officers used some other type of "coercive power." Cf. 245 Fed. Appx. 343, 2007 WL 1655304 at *5 (citing NAACP v. Button, 371 U.S. 415, 433(1963); Aebisher v. Ryan, 622 F.2d 651, 655 (2d Cir.1980)).

23

actions cannot suffice to render the municipality liable. *See Praprotnik*, 485 U.S. at 130. ("[T]he mere failure to investigate the basis of a subordinate's discretionary decisions does not amount to a delegation of policymaking authority, especially where . . . the wrongfulness of the subordinate's decision arises from a retaliatory motive or other unstated rationale.").

The interpretation of Columbia's counsel, Carroll, and its officer, Bennett, of state law also fails to establish a widespread practice of applying inapplicable statutes to restrict the Preachers' First Amendment rights. Both the letter from counsel and Bennett's conversation with Mrs. Russell occurred after February 12, 2005, the only incident upon which this lawsuit was based. And, in any event, the Preachers were never required to obtain a permit or authorization from the town council, returned to demonstrate, and were not arrested again on the basis of the standing or permit statute.

Finally, the events of May 21, 2005, do not create an inference of a widespread policy or custom of violating the Preachers' First Amendment rights. In its Ruling on the parties' second cross-motions for summary judgment, the Court cited Fifth Circuit precedent for the general proposition that subsequent conduct by a municipal policymaker may be used to prove preexisting disposition and policy for purposes of a § 1983 action. *See Grandstaff v. City of Borger, Tex.*, 767 F.2d 161 (5th Cir. 1985), *abrogated on other grounds* in *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 167 (1993); *see id.* at 171 ("The disposition of the policymaker may be inferred from his conduct after the events of that night."). While the Fifth Circuit made that general statement, it has never applied this general proposition to First Amendment violations and has since limited its application of *Grandstaff* to the context of "extreme factual situations." The Fifth Circuit has explained that:

[in *Grandstaff*,] we imposed municipal liability [under § 1983] for a policy of

24

> "prevalent recklessness" when a group of police officers mistook a man for a fugitive, surrounded him, and killed him.  *Grandstaff* has not enjoyed wide application in this Circuit.  For example, we distinguished it in *Coon v. Ledbetter*, 780 F.2d 1158, 1161 (5th Cir.1986), noting that "Grandstaff affirmed a judgment against a Texas city on a highly peculiar set of facts. . . The *Grandstaff* panel emphasized the extraordinary facts of the case, and **its analysis can be applied only to equally extreme factual situations."**

*Snyder v. Trepagnier*, 142 F.3d 791, 797-98 (5th Cir. 1998) (emphasis added) (refusing to apply the *Grandstaff* inference to impose municipal liability under § 1983 for the shooting of a suspect fleeing from police because the case did not present "'extraordinary factual circumstances,'" "given the absence of evidence suggesting a culture of recklessness in the [New Orleans Police Department.") (citation omitted).

Even if the general proposition contained in *Grandstaff* were to apply, the events of the Riverboat Days Festival on May 21, 2005, do not constitute the type of extreme or extraordinary factual circumstances sufficient to hold Columbia liable. While Russell did not believe that the Preachers had an agreement with Columbia to stand along the Columbia bridge and out of the intersection of Pearl Street and Highway 165, both Chief Crockett and Coleman, the plaintiff in this case, testified that there was some compromise or agreement. The Preachers did, in fact, stand along the bridge without incident until the funeral procession passed by. It was only after they returned from their break that the Preachers refused to move up the bridge.

Additionally, the events that occurred after the Preachers' break do not show that Columbia had a widespread practice of applying inapplicable statutes to restrict their constitutional rights. Chief Crockett is never heard to refer to any "state law" requiring the Preachers to stand a certain number of feet from the intersection. Coleman testified, not that they were required to stand twenty-five feet back because of a state law, but that there had been some compromise with officers when

they arrived, but the officers then pushed the Preachers further back than he thought they should have been. While some officers can be heard citing "state law" in the video, neither Coleman nor Russell was charged with a violation of the standing statute or any other state statute regarding the distance a person may stand from an intersection. In fact, the inapplicable standing statute, relied upon by Miles in charging Russell in the February 12th incident, states that "[n]o person shall stand . . . **twenty feet**" from a traffic light. *See* LA. REV. STAT. § 32:143A ("No person shall stand, or park a vehicle, except when necessary to avoid conflict with other traffic, or in compliance with law or the directions of a police officer or traffic control device, in . . .[w]ithin twenty feet upon the approach to any flashing beacon stop sign, or traffic control signal located at the side of a roadway").

Regardless, the Riverboat Days Festival simply involved an entirely different scenario at a different intersection with different safety concerns, crowd control, and traffic problems from the demonstration on February 12, 2005. While the parties certainly disagree about what should have taken place that day, none of the actions of Columbia and other law enforcement officers on May 21, 2005, are so extreme to prove the existence of a widespread practice of restricting the Preachers' First Amendment rights on February 12, 2005, by resorting to inapplicable statutes.

Finally, even after the Riverboat Days Festival, the Preachers continued to demonstrate in Columbia on several occasions, even at the same intersection in front of the FUMC.[26] Columbia officers did not attempt to arrest them, threaten to arrest them, or require them to end their demonstrations.

Accordingly, the Court finds that WWSPF and Coleman have failed to establish that

---

[26]As previously noted, the intersection no longer exists today, but did exist for more than two years following the River Boat Days Festival.

26

Columbia had a widespread practice of restricting their First Amendment rights by using inapplicable statutes. Columbia is not liable under § 1983 for Miles's violations of their First Amendment rights. The Court enters judgment in favor of Columbia and against WWSPF and Coleman.

MONROE, LOUISIANA, this 7th day of November, 2008.

ROBERT G. JAMES
UNITED STATES DISTRICT JUDGE